Leonard T. Strand, Chief Judge
I. INTRODUCTION
This matter is before me on a motion (Doc. No. 91) for summary judgment filed by defendant Forward Air, Inc. (Forward). Plaintiffs Gary, Nicholas and Ryan Rohlfs (the Rohlfs) have filed a resistance (Doc. No. 102) and Forward has filed a reply. Doc. No. 110. The Rohlfs' also filed a notice (Doc. No. 112) of supplemental authority. I find that oral argument is not necessary.[1] See N.D. Iowa L.R. 7(c).
II. PROCEDURAL BACKGROUND
This case arises out of a fatal three-vehicle crash on Highway 175 west of Lake View, Iowa, on December 24, 2016. Ivan Milosevic was driving a semi-truck westbound when he crossed the center line into oncoming traffic, striking an eastbound vehicle occupied by Gary and Sharon Rohlf. This collision caused a second collision between the Rohlf vehicle and a vehicle occupied by Barbara Scott and Jeanette Fertig. Sharon Rohlf died as a result of the collision, while Gary Rohlf and Barbara Scott sustained injuries. On January 13, 2017, Barbara and Everett Scott (the Scotts) filed a complaint (Doc. No. 1) alleging negligence and vicarious liability against defendants Milosevic and U.S. Expediters, Inc. (Expediters).
On April 6, 2017, the Rohlfs filed a complaint alleging negligence, vicarious liability and negligent hiring, training and supervision against Milosevic and Expediters. Doc. No. 1 in C17-4022-LTS. The two cases were consolidated on June 8, 2017. Doc. No. 10. Subsequently, the Scotts and the Rohlfs amended their complaints to add defendants Sirius Air Logistics (Sirius) and Forward.[2] Doc. Nos. 60, 61. In Division V of the Rohlfs' Second Amended *761 Complaint, they list various theories of alleged negligence on Forward's part. Doc. No. 61 at 11.
Milosevic and Expediters answered (Doc. Nos. 62, 63) the amended complaints while Sirius and Forward filed motions to dismiss for lack of personal jurisdiction, which were denied. Doc. No. 78. Sirius and Forward answered on May 30, 2018. Doc. Nos. 81, 82. The present motion for summary judgment was filed November 23, 2018. This matter is scheduled for a jury trial beginning April 22, 2019.
III. SUMMARY JUDGMENT STANDARDS
Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett , 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
A material fact is one "that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, "the substantive law will identify which facts are material." Id. Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. Id. "An issue of material fact is genuine if it has a real basis in the record," Hartnagel v. Norman , 953 F.2d 394, 395 (8th Cir. 1992) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp. , 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ), or "when 'a reasonable jury could return a verdict for the nonmoving party' on the question," Woods v. DaimlerChrysler Corp. , 409 F.3d 984, 990 (8th Cir. 2005) (quoting Anderson , 477 U.S. at 248, 106 S.Ct. 2505 ). Evidence that only provides "some metaphysical doubt as to the material facts," Matsushita , 475 U.S. at 586, 106 S.Ct. 1348, or evidence that is "merely colorable" or "not significantly probative," Anderson , 477 U.S. at 249-50, 106 S.Ct. 2505, does not make an issue of material fact genuine. Put another way, "[e]vidence, not contentions, avoids summary judgment." Reasonover v. St. Louis Cnty. , 447 F.3d 569, 578 (8th Cir. 2006) (citation omitted). The parties "may not merely point to unsupported self-serving allegations." Anda v. Wickes Furniture Co. , 517 F.3d 526, 531 (8th Cir. 2008).
As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." Anderson , 477 U.S. at 249, 106 S.Ct. 2505 (quotations omitted). The party moving for entry of summary judgment bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." Hartnagel , 953 F.2d at 395 (citing Celotex , 477 U.S. at 323, 106 S.Ct. 2548 ). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. Mosley v. City of Northwoods , 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. Id. If a party fails to *762 make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. Celotex , 477 U.S. at 322, 106 S.Ct. 2548.
To determine whether a genuine issue of material fact exists, I must view the evidence in the light most favorable to the nonmoving party. Matsushita , 475 U.S. at 587-88, 106 S.Ct. 1348. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. Id. However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." Kammueller v. Loomis, Fargo & Co. , 383 F.3d 779, 784 (8th Cir. 2004) (citing Quick v. Donaldson Co. , 90 F.3d 1372, 1376-77 (8th Cir. 1996) ). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." Quick , 90 F.3d at 1377.
IV. RELEVANT FACTS
Unless otherwise noted, the following facts are undisputed:
A. The Parties
Plaintiff Gary Rohlf was a resident of Odebolt, Iowa, and was married to Sharon Rohlf at the time of the accident. Doc. No. 61 at ¶¶ 2-3. Nicholas and Ryan Rohlf are residents of Iowa and are the children of Gary and Sharon. Id. at ¶¶ 4-5. Sharon died as a result of the motor-vehicle accident on December 24, 2016, that involved Milosevic and a second passenger car.
Milosevic was driving a 2007 Volvo semi-truck at the time of the collision. Doc. Nos. 60 at ¶¶ 5-6; 61 at ¶¶ 19. Sirius, an Illinois corporation with its principal place of business in Brookfield, Illinois, owned the semi-truck and employed Milosevic. Doc. No. 66 at 20. Sirius is not a motor carrier-it does not have authorization from the Federal Motor Carrier Safety Administration (FMCSA) to "engage[ ] in the transportation of goods or passengers for compensation." Id. , see also 49 C.F.R. 390.5 (defining for-hire motor carrier). Instead, Sirius enters leases as defined in 49 C.F.R. § 376.2(e), through which it grants the use of its equipment, with a driver, for a specified period to an authorized motor carrier. Doc. No. 66 at 20.
Expediters, an Illinois corporation with its principal place of business in Countryside, Illinois, is an authorized motor carrier. Doc. No. 60 at ¶ 2; Doc. No. 61 at ¶ 6. On November 11, 2016, Sirius and Expediters entered into a lease agreement whereby Expediters could use the semi-truck, operated by Milosevic, for hauling freight in interstate commerce. Doc. No. 66 at 21-31. At the time of the accident, Expediters was shipping freight on behalf of Forward, a Tennessee corporation. Forward is a licensed transportation broker under 49 U.S.C. § 13904. Doc. No. 91-3 at 11. As a transportation broker, Forward does not own or operate any motor vehicles. Id. at 6. Instead, Forward arranges for the transportation of goods between a shipper and consignee. Id. at 6.
B. Forward's Selection of Expediters as a Motor Carrier
Forward submitted the affidavit of Michael Casey, its Vice President of Safety, to describe how Forward qualifies motor carriers when it arranges for the transportation of goods. See Doc. No. 91-3 at 5-10. When selecting a motor carrier, Forward uses the following policy:
(1) a carrier must have current motor carrier authority from the United States Department of Transportation (USDOT), (2) the carrier must have public liability insurance in amounts that exceed the federal financial responsibility *763 limits for motor carriers, and (3) the motor carrier must not have an "Unsatisfactory" safety rating.[3] In addition, the motor carrier must sign a Broker-To-Carrier Agreement (BCA) with Forward Air, Inc.
Id. at 6.
Forward further requires that the Carrier maintain certain safety requirements and incorporates this requirement into the "Carrier's Representations and Warranties" section of the BCA:[4]
Carrier shall have an active and effective safety program to monitor the safety of its fleet and its drivers. Carrier shall utilize only competent, able and legally licensed personnel in the performance of services hereunder. Carrier shall have full control of such personnel. Carrier shall be solely responsible for ensuring, and will ensure, at Carrier's cost and expense, that such personnel are fully qualified to perform services hereunder, and that such personnel have access to all locations into which access necessary to perform services under this Agreement.
Id. at 8 (statement of Michael Casey), 28 (BCA between Forward and Expediters), 35-36 (sample BCA). The BCA provides that the carrier "shall have exclusive control of and direction over the equipment, personnel, and vehicles used in the performance of services pursuant to this Agreement" (id. at 25), and that "Carrier shall be solely responsible for its day-to-day operations including, but not limited to, setting appropriate routes." Id. at 28. Finally, the BCA requires that:
[A]ll freight tendered to it by Broker shall be transported on equipment operated only under the authority of Carrier, and that Carrier shall not in any manner sub-contract, broker, or in any other form arrange for the freight to be transported by a third party without the prior written consent of Broker. If substituted service is utilized, carrier agrees to only use such carriers that comply with all of the safety, service, and insurance requirements set forth in this Agreement.
Id. at 29.
In October 2016, Expediters and Forward entered into a BCA. Id. at 25-32. Expediters' carrier profile included a certificate of insurance (id. at 15) and an FMCSA certificate of motor carrier authority (id. at 17). To ensure initial fitness for a BCA and ongoing compliance with the terms of the BCA, Forward subscribes to a motor carrier monitoring service called Carrier411, which "sends a daily *764 report to Forward Air advising Forward Air of any change in the status of a motor carrier on Forward Air's list of approved motor carriers." Id. at 8. Forward informed Carrier411 that it was adding Expediters to its list of approved motor carriers, and Forward reviewed the report generated by Carrier411 prior to finalizing the agreement. Id. at 8.
Milos Milutinovic, the president and sole owner of Expediters, testified that the process of signing up for the BCA took about ten minutes. Doc. No. 102-3 at 21. Milutinovic stated that he never provided information on driver qualifications to Forward, and that he did not inform Forward that Expediters was leasing trucks and drivers from Sirius. Id. at 22. Further, Milutinovic admitted that he represented to Forward that Expediters had 15 semi-trucks available, when it in fact had four.
From October 1, 2016 to December 23, 2016, Expediters hauled seven loads for Forward without any reported problems, and with no change in Expediters' status on Carrier411. Doc. No. 91-3 at 8. On January 10, 2017, Forward requested a report from Carrier411 and the report showed that Expediters had one roadside inspection that showed no acute or critical safety violations for the months of October, November or December 2016. Id. at 41-48. Publicly available reports prepared by the FMCSA (SAFER and SMS) show that Carrier411's data was incomplete: Expediters had seven DOT inspections during that time, resulting in four violations, including two out-of-service violations.[5] Doc. No. 102-8 at 57-64.
C. Expediters' Record
Although Expediters' record on Carrier411 appeared clean, there is evidence to suggest that this was only because Expediters had not been operating long enough to incur violations at the time of the crash. Dr. Thomas Corsi, an expert for the plaintiffs, testified that Expediters was a "new entrant" carrier, i.e., a motor carrier that had received its motor carrier authorization only recently.[6] Doc. No. 102-3 at 8-9. Expediters obtained its certificate in August 2016 and carried its first load in October 2016, when it entered into a BCA agreement with Forward. Id. at 8, 17. As of October 18, 2018, Expediters was "unrated" by the FMCSA, which means it had not undergone a compliance review.
Milutinovic worked as a transportation manager for a different company for four years before starting Expediters. Doc. No. 102-3 at 17-18. Other than Milutinovic, Expediters had two part-time employees: Sonia Josipovic worked as the safety director and Bonnie Milicivic did accounting and dispatching. Id. The truck involved in the accident at issue - owned by Sirius and driven by Milosevic - was the first truck that Expediters leased and put on the road. Id. at 19.
Expediters was responsible for making sure that its drivers, including Milosevic, were qualified. Doc. No. 102-3 at 20. Milutinovic testified that he was concerned with making sure the leased drivers have a valid commercial driver's license (CDL), a clean safety record and a clean criminal record. Id. Expediters did not administer a driving test. However, Milutinovic testified that he had Milosevic and his co-driver *765 complete one delivery as a "test" to confirm that the drivers knew what they were doing, and Expediters then made the decision to keep them on (through Sirius) as leased drivers. Id.
Milosevic is not a United States citizen but was present in the United States on a non-immigrant J1 visa that expired in August 2016. Doc. No. 102-7 at 28. Rather than working as permitted under the visa, Milosevic completed a 36-hour CDL course[7] and applied for his CDL. After failing and retaking the test once, Milosevic was granted a CDL by the state of Massachusetts. Although Milosevic's non-commercial driver's license was properly issued under his J1 visa, by the time he applied for and received his CDL on October 24, 2016, his J1 visa had expired and he was technically ineligible for a CDL based on his immigration status. Id.
V. DISCUSSION
The Rohlfs' second amended complaint claims that Forward is liable for negligently breaching its duty of investigating and hiring its independent contractor, Expediters.[8] Doc. No. 61 at ¶¶ 65-66. Forward seeks summary judgment on the basis that (1) it did not fail to exercise reasonable care in hiring Expediters and (2) and plaintiffs' cause of action is preempted by § 14501(c)(1) of the Federal Aviation Administrative Authorization Act of 1994 (§ 14501(c)(1) or the Act). The Rohlfs generally resist. I will address only those arguments that are necessary to resolve the present motion.
A. Independent Contractor/Employer Liability
The parties generally agree that Forward and Expediters have a relationship akin to that of an employer and independent contractor, and that Expediters has responsibility for its driver's actions. Generally, one who employs an independent contractor cannot be held liable for the independent contractor's negligence. Lunde v. Winnebago Indus., Inc. , 299 N.W.2d 473, 475 (Iowa 1980).[9] A narrow exception applies under the Restatement (Second) of Torts § 411:
An employer is subject to liability for physical harm to third persons caused by his failure to exercise reasonable care to employ a competent and careful contractor
(a) to do work which will involve a risk of physical harm unless it is skillfully and carefully done, or
(b) to perform any duty which the employer owes to third persons.
Jones v. Schneider Nat., Inc. , 797 N.W.2d 611, 614 (Iowa Ct. App. 2011) (adopting the Restatement). To establish a claim for negligent selection of an independent contractor, the Rohlfs must demonstrate (1) that Forward knew or should have know *766 that Expediters was incompetent to perform the work and (2) that Forward's negligent selection of Expediters proximately caused the Rohlfs' injuries. Id. at 617.
The Rohlfs argue that driving a semi-truck is "work which will involve a risk of physical harm unless it is skillfully and carefully done," and that Forward did not comply with the industry standard of care in selecting Expediters, a new company with no track record of safety and demonstrated incompetence. Forward argues that it exercised reasonable care in selecting Expediters, that Expediters is a "competent and careful contractor" as defined in the Restatement because it is certified by the FMSCA, and that driving a semi-truck does not fall into the circumstances in § 411 in which vicarious liability applies. Neither party has addressed the proximate cause element of the negligent selection claim. As such, I will assume that material disputed facts exist as causation.
1. Application of § 411
Forward argues that "[t]he duty of an experienced shipper or broker to investigate the competence of the carrier it hires applies only where the shipment is unusually dangerous." Doc. No. 91-2 at 8. (citing Alaubali v. Rite Aid Corp. , 320 Fed. Appx. 765, 767 (9th Cir. 2009) ; L.B. Foster Co. v. Hurnblad , 418 F.2d 727, 731-32 (9th Cir. 1969) ).[10] Forward contends that the load carried by Expediters on December 24, 2016, was not unusually dangerous and, therefore, no special duty applied. However, as the Rohlfs point out, this is not how § 411 has been applied in Iowa. In Jones , the Iowa Court of Appeals evaluated whether the motor carrier was negligently hired without regard to the content or type of the shipment. See 797 N.W.2d at 616-17.[11] Further, the Restatement specifies that:
The amount of care which should be exercised in selecting an independent contractor is that which a reasonable man would exercise under the circumstances, and therefore varies as the circumstances vary.
Certain factors are important: (1) the danger to which others will be exposed if the contractor's work is not properly done; (2) the character of the work to be done - whether the work lies within the competence of the average man or is work which can be properly done only by persons possessing special skill and training; and (3) the existence of a relation *767 between the parties which imposes upon the one a peculiar duty of protecting the other.
Restatement (Second) of Torts § 411 cmt. c. While the Iowa Supreme Court has not had occasion to address this issue, I predict that it would decline to limit the application of § 411 to those instances in which a shipment is unusually dangerous. I will therefore consider whether Forward has established a lack of material disputed facts on the remaining elements of negligent selection.
2. Expediters' Competence
Forward argues that Expediters was a competent and careful contractor, such that it cannot be held liable under a negligent selection theory. Riley , 2017 WL 2501138 at *2 ("[A]n employer is not liable for the negligence of its independent contractor, notwithstanding any lack of care it took in selecting the contractor, if the contractor hired was in fact competent."). Forward contends that at the time it was hired, Expediters was operating lawfully as a registered and licensed interstate motor carrier, indicating that it had the ability and available equipment to do the work without creating an unreasonable risk of injury to others. See 49 U.S.C. § 31144(a)(1) ("The Secretary shall determine whether an owner or operator is fit to operate safely commercial motor vehicles..."); 49 C.F.R. § 365.109 (governing review of application for motor carrier certificate). Expediters had insurance coverage as required by law and did not have a "conditional" or "unsatisfactory" safety rating. Finally, the BCA included several "warranties" that required Expediters to carry out its work in accordance with the law.
The Rohlfs respond that there is sufficient evidence to generate a jury question as to Expediters' competence. Expediters was a new carrier and its sole owner, president and full-time employee, Milutinovic, did not have prior experience operating motor carriers. Further, Expediters was a participant in the new entrant program and new entrants have a statistically higher rate of accidents coupled with a lack of data to prove that they can comply with the relevant safety regulations. At the time Expediters was hired, it had not yet finished its new entrant safety audit and had not yet been rated by the FMCSA. Finally, Expediters did not vet their drivers beyond certifying that they had a valid CDL and a clean criminal background check, and hired Milosevic, who had never had a job as a truck driver, had little training and lacked lawful status in the United States.
Comment a to § 411 defines "competent and careful contractor" as:
[A] contractor who possesses the knowledge, skill, experience, and available equipment which a reasonable man would realize that a contractor must have in order to do the work which he is employed to do without creating unreasonable risk of injury to others, and who also possesses the personal characteristics which are equally necessary.
Restatement (Second) of Torts § 411 cmt. a. Competency does not require perfection. See Jones , 797 N.W.2d at 616-17 (fact that driver was partially deaf, possibly diabetic and had a history of traffic violations did not compel conclusion that he was incompetent). Further, "a contractor's negligence in conducting the work it was hired to do creates no presumption that the employer was negligent in selecting the contractor. One incident of poor judgment does not prove incompetence." Riley , 2017 WL 2501138 at *2.
I find that there is a triable issue of fact as to whether Expediters was competent to perform the work it was contracted *768 to perform. The Rohlfs' expert, Dr. Corsi, testified that new entrant motor carriers have a crash rate that is 50% higher than experienced motor carriers and that they are known to be less reliable, in part because of difficulty complying with the numerous regulations that affect interstate hauling. In this case, there is evidence that Expediters did not thoroughly vet the drivers or the trucks that it leased, which did not have their own FMCSA motor carrier certificates and operated under Expediters' certificate. Further, between October 1 and December 23, 2016, Expediters had seven DOT inspections, which resulted in four violations, including two out-of-service violations. Forward has not offered any evidence that Expediters was competent at the time of hiring other than its motor carrier certificate and its proof of insurance. A reasonable jury could infer from these facts that Expediters was not competent.
3. Forward's Duty of Care
Forward argues that regardless of whether Expediters was a competent independent contractor, it exercised reasonable care in hiring Expediters. Before entering into a BCA with Expediters, Forward took steps to make sure that Expediters was a "legally qualified" independent contractor. Forward confirmed that Expediters possessed a motor carrier certificate from the FMCSA and that it carried appropriate liability insurance. Forward also monitored the status of Expediters' certificate using Carrier411. Forward further required Carrier to warrant that it would hire only qualified drivers, comply with certain safety procedures and protocols, and use safe equipment.
In response, the Rohlfs rely heavily on the fact that Expediters were a "new entrant" motor carrier with no record of safety and argue that this fact should have triggered a more extensive inquiry because new entrants have a statistically higher rate of motor vehicle collisions. Had Forward inquired further, the Rohlfs argue, it would have discovered that Expediters' president and sole full-time employee had no experience in hiring or managing truck drivers, that Expediters had misrepresented the number of trucks available to it, and that Expediters neither vetted nor trained its drivers. The Rohlfs also argue that Forward could have discovered that Milosevic was issued a CDL in error, had only completed 36 hours of training and had no previous experience as a truck driver. The Rohlfs' criticize Forward's decision to use only the Carrier411 website, which apparently did not contain sufficiently up-to-date information. Forward has not offered evidence to explain why it did not rely on FMCSA's websites, nor has it submitted expert opinions on the "industry standard" as it relates to hiring new entrant motor carriers or investigating motor carriers generally.
The Rohlfs have submitted expert testimony as to the industry practice when dealing with new entrant motor carriers and unrated motor carriers like Expediters. Dr. Corsi testified that some brokers will not enter into BCAs with new entrants until they have been in the business for at least a year (or in extreme cases, five years). Doc. No. 95-5 at 10. Further, some brokers will not enter into BCAs with motor carriers who do not have a successful compliance review ("unrated") without further inquiry. Id. at 9.
I find that the Rohlfs have submitted enough evidence to generate a jury issue as to whether Forward's investigation of Expediters was reasonable. Other courts have held that the red flags present in this case - the fact that Expediters was a "new entrant" motor carrier with no record of inspections and very little experience *769 - should have prompted further inquiry. See, e.g. , Jones , 558 F.Supp.2d at 644-46 (motor carrier's low safety scores, history of regulatory violations and hiring of novice driver generated a fact issue on duty to investigate further); Beavers , 38 F.Supp.3d at 1272-73 (same). It does not automatically follow that it would have been negligent to hire Expediters if Forward had all the above information at the time of hiring, or that Forward's alleged negligence was a proximate cause of the collision. These are issues for the jury.
B. Preemption
Forward argues that the Federal Aviation Administrative Authorization Act of 1994 (FAAAA) preempts personal injury claims. The FAAAA preemption clause states:
(c) Motor carriers of property. -
(1) General rule. - Except as provided in paragraphs (2) and (3), a State ... may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier ... or any motor private carrier, broker, or freight forwarder with respect to the transportation of property.
(2) Matters not covered. - Paragraph (1) -
(A) shall not restrict the safety regulatory authority of a State with respect to motor vehicles, the authority of a State to impose highway route controls or limitations based on the size or weight of the motor vehicle or the hazardous nature of the cargo, or the authority of a State to regulate motor carriers with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization.
49 U.S.C. § 14501(c).[12]
Two circuit courts of appeal have interpreted this provision in the context of personal injury claims arising from an airline's negligent acts and have held that such claims are not preempted. See Charas v. Trans World Airlines, Inc. , 160 F.3d 1259, 1266 (9th Cir. 1998) ("Congress ... intended to insulate the industry from possible state economic regulation... [i]t did not intend to immunize the airlines from liability for personal injuries caused by their tortious conduct."); Hodges v. Delta Airlines, Inc. , 44 F.3d 334 (5th Cir. 1995) ("[N]either the ADA nor its legislative history indicates that Congress intended to displace the application of state tort law to personal physical injury inflicted by aircraft operations, or that Congress even considered such preemption."). Likewise, many federal and state trial courts have held that negligence claims against brokers are not preempted by the FAAAA. See Doc. No. 100-2 at 10 (collecting cases).
While the Supreme Court has not yet addressed the issue of whether state personal injury claims should be preempted, nothing in the Supreme Court decisions considering FAAAA or ADA preemption forecloses such claims. In Am. Airlines, Inc. v. Wolens , 513 U.S. 219, 235, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995), for example, Justice Stevens noted in a concurring opinion that "private tort actions based on common-law negligence or fraud ... are not preempted."
*770 The Eighth Circuit has not ruled definitively on whether personal injury claims are exempted from preemption under the FAAAA. However, the court has noted that such preemption would likely be inconsistent with the purposes of the statute:
Laws related to "safety" are not synonymous with laws related to "service." It is unlikely, for example, that all personal-injury claims against air carriers based on unsafe operations or maintenance are expressly pre-empted by the ADA, given that federal law requires carriers to maintain insurance for bodily injury, death, or property damages resulting from "the operation or maintenance of the aircraft." 49 U.S.C. § 41112(a) ; see Wolens , 513 U.S. at 231 n.7, 115 S.Ct. 817 ; Taj Mahal Travel, Inc. v. Delta Airlines, Inc. , 164 F.3d 186, 194 (3d Cir. 1998). Congress was concerned with variations in state law only insofar as they related to a price, route, or service of an air carrier. See Dilts [v. Penske Logistics, LLC] , 769 F.3d [637,] at 647-48 [ (9th Cir. 2014) ].
Watson v. Air Methods Corp. , 870 F.3d 812, 819 (8th Cir. 2017) (state wrongful discharge claim based on state statute protecting safety violations whistleblowers was not preempted); see also Bower v. Egyptair Airlines Co. , 731 F.3d 85, 95 (1st Cir. 2013) ("[T]he fact that the ADA insurance provision mandates that airlines carry sufficient insurance to pay 'for bodily injury to, or death of' its passengers suggests that Congress never intended to preempt personal injury claims.").
Based on the authorities discussed above, I hold that the FAAAA does not preempt personal injury claims such as the Rohlfs' claim against Forward. Forward is not entitled to summary judgment on this basis.
VI. CONCLUSION
For the foregoing reasons, Forward's motion (Doc. No. 91) for summary judgment is granted in part and denied in part , as follows:
1. The motion is denied as to the Rohlfs' claim for negligent hiring of an independent contractor. That claim will proceed to trial.
2. The motion is granted as to all other claims asserted against Forward by the Rohlfs, as set forth in Division V of the Rohlfs' Second Amended Complaint (Doc. No. 61). Those claims are hereby dismissed .
IT IS SO ORDERED .

The Rohlfs have filed motions (Doc. Nos. 92, 93) to exclude two of Forward's expert witnesses. Because Forward's motion for summary judgment does not rely on testimony from either of those witnesses, I will address the Rohlfs' motions in a separate order.

On January 4, 2019, the Scotts filed a joint stipulation of dismissal (Doc. No. 107), and on January 7, 2019, I entered an order (Doc. No. 111) dismissing all the Scotts' claims. The Rohlfs are the only remaining plaintiffs in this consolidated action.

The FMCSA conducts periodic compliance reviews and issues carriers a safety rating of "satisfactory," "conditional," or "unsatisfactory." A "satisfactory" rating indicates that the motor carrier "has adequate safety management controls in place, which function effectively to ensure acceptable compliance with applicable safety requirements." 49 C.F.R. § 385.3. A "conditional" rating indicates that some rules have been violated and that the carrier's operating authority will be revoked unless it presents evidence of necessary corrective action. Id. An "unsatisfactory" rating means "a motor carrier does not have adequate safety management controls in place to ensure compliance with the safety fitness standard[s]." Id. Because the FMCSA has limited resources, 93% of motor carriers are unrated. Doc. No. 91-3 at 53.

There is some dispute over whether this particular term (¶ 1.j.) is actually included in the BCA between Expediters and Forward. The copy of the agreement signed by the parties contains only the last half of the last sentence of ¶ 1.j. Doc. No. 91-3 at 28. Forward asserts that the term was in the signed BCA, but that a formatting error resulted in the inadvertent deletion of part of ¶ 1.j. See id. at 7 n.12. The Rohlfs, who are not a party to the contract, assert that it is not clear whether the term was meant to be included. For the purposes of this motion, I will proceed as if the term were included.

An "out-of-service" violation is a citation issued to a motor carrier for a driver who has driven more than the permitted amount of time. See 49 C.F.R. § 395.13

"New entrants" are authorized to conduct business with their motor carrier certificate but they are subject to safety audits. Expediters passed a safety audit and exited the New Entrant program on February 12, 2018. Doc. No. 110-2 at 8, 11.

Milosevic did not complete a "classroom" CDL course, rather he took private driving lessons through Amaral Auto & Truck Driving School in Massachusetts. Doc. No. 102-6 at 17. Milosevic signed a waiver acknowledging that this training would not qualify as "the minimum training requested by the state" for the purposes of issuing a CDL. Id.

The amended complaint also states claims for vicarious liability based on an employer-employee relationship between the parties, a joint venture relationship between the parties, and Forward's status as a motor carrier. Doc. No. 61 at 11. Although Forward has moved for summary judgment on each theory advanced in the complaint, the Rohlfs have responded only to the argument that Forward did not negligently hire Expediters as an independent contractor. As such, I deem the other theories of negligence advanced against Forward to be abandoned and will grant Forward's motion as to those claims.

The parties assume that Iowa law applies to this claim, and I will as well.

Although the Ninth Circuit cases cited by Forward are not binding, they are also not particularly persuasive. In L.B. Foster Co. , the Ninth Circuit held that the defendant broker could rely on an assumption that its chosen independent contractor was operating in compliance with the law and utilizing proper equipment if it was a "casual shipper of goods or commodities of a weight or character which did not involve any unusual risk to other highway users." 418 F.2d at 731 (citing Moore v. Roberts , 93 S.W.2d 236, 239 (Tex. Civ. App. 1936) ). However, this holding is suspect, both because it predates the FMCSA by 30 years and because it is an outlier in the field of cases applying negligent selection claims to brokers regardless of the contents of their shipments. Although Alaubali repeated the rule pronounced by the Ninth Circuit in L.B. Foster , Alaubali was a summary opinion that did not fully address the underlying relationship between the defendant - a pharmacy store chain rather than a broker - and the shipping company it hired.

Other jurisdiction have similarly applied § 411 to brokers that select or hire motor carriers to complete shipments without regard to the dangerousness of the contents of the shipments. See, e.g. Riley v. A.K. Logistics, Inc. , 1:15-cv-69-AR, 2017 WL 2501138, at *5 (E.D. Mo. June 9, 2017) (same); Beavers v. Victorian , 38 F.Supp.3d 1260, 1272-73 (W.D. Okla. 2014), Jones v. C.H. Robinson Worldwide, Inc. , 558 F.Supp.2d 630, 647 (W.D. Va. 2008) ; Schramm v. Foster , 341 F.Supp.2d 536, 551 (D. Md. 2004).

In interpreting the preemption provision of the FAAAA, courts may rely on cases applying the nearly identical preemption provision of the Airline Deregulation Act (ADA) at 49 U.S.C. § 1305(a)(1). See Rowe v. N.H. Motor Trans. Ass. , 552 U.S. 364, 128 S.Ct. 989, 169 L.Ed.2d 933 (2008).